```
┌─────────────────────────────────────┐
│ ✗ FILED        ____ LODGED           │
│ ____ RECEIVED  ____ COPY             │
│                                      │
│        MAY - 1 2013                  │
│                                      │
│   CLERK US DISTRICT COURT            │
│     DISTRICT OF ARIZONA              │
│ BY_____ DEPUTY            │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re: | 13- 6258MB |
| Search Warrant For: | **ORDER** |
| 35 Sunrise Avenue, Apartment F in the City of Sedona and Coconino County, Arizona | (Filed Under Seal) |

Based upon the Motion of the United States of America, and good cause appearing,

IT IS ORDERED that the Application and Affidavit for the Search Warrant, and the Motion to Seal and this Order are hereby sealed on the grounds that disclosure would jeopardize an ongoing investigation and should remain sealed until further order of this Court.

DATED this 23ʳᵈ day of April, 2013.

_____
HONORABLE DAVID K. DUNCAN
United States Magistrate Judge



```
                                                    ___X FILED    ____ LODGED
                                                    ____ RECEIVED ____ COPY

                                                         MAY - 1 2013

                                                    CLERK US DISTRICT COURT
                                                      DISTRICT OF ARIZONA
                                                    BY_____ DEPUTY
```

1   **JOHN S. LEONARDO**
    United States Attorney
2   District of Arizona

3   **JENNIFER LEVINSON**
    Assistant U.S. Attorney
    Arizona State Bar No. 020551
4   Two Renaissance Square
    40 N. Central Avenue, Suite 1200
    Phoenix, Arizona 85004-4408
5   Telephone: (602) 514-7500
    Jennifer.Levinson@usdoj.gov

6

7                      UNITED STATES DISTRICT COURT

8                           DISTRICT OF ARIZONA

9   In Re:                                  13- 6258MB

10  Search Warrant For:                     **MOTION TO SEAL SEARCH**
                                            **WARRANT APPLICATION AND**
11  35 Sunrise Avenue, Apartment F in the City    **AFFIDAVIT**
    of Sedona and Coconino County, Arizona
12                                          (Filed Under Seal)

13

14        The United States of America moves this Court for an Order sealing the Application and

15  Affidavit for the Search Warrant, and the Motion to Seal and the Order to Seal in this matter, on

16  the grounds that disclosure would jeopardize an ongoing investigation.

17        Respectfully submitted this 23rd day of April, 2013.

18                                          JOHN S. LEONARDO
                                            United States Attorney
19                                          District of Arizona

20

21

22                                          JENNIFER LEVINSON
                                            Assistant United States Attorney
23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

for the

District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>35 Sunrise Avenue, Apartment F in the City of<br>Sedona and Coconino County, Arizona | )<br>)<br>)<br>)<br>)<br>) |

Case No.  13-6258MB

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, James K. Marcy, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
SEE ATTACHMENT A incorporated herein by reference.

located in the _____ District of _____ Arizona _____ , there is now concealed *(identify the person or describe the property to be seized):*
SEE ATTACHMENT B incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Sections | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1341, 1343 and 1512 | Conspiracy to defraud the United States; Mail Fraud; Wire Fraud; and Obstruction of Justice |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT INCORPORATED BY REFERENCE HEREIN.

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Authorized by AUSA Jennifer Levinson

*Applicant's signature*

James K. Marcy, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  Apr. 23, 2013

*Judge's signature*

City and state:  Phoenix, Arizona

Honorable David K. Duncan, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

**Property to Be Searched**

35 Sunrise Avenue, Apartment F in the City of Sedona and Coconino County, Arizona is one residential unit within a two-story duplex or townhome building that is part of a multi-building development known as The Compound. The development consists of approximately nine total residential units. While the mailbox for 35 Sunrise Avenue, Apartment F is located on Sunrise Avenue, the residence is accessed from Mountain View Drive via a driveway that runs parallel to Sunrise. The north side of the entrance to the driveway bears a sign that reads "The Compound." Apartment F is accessed on the second floor and on the east side of the southwestern-most building within the Compound, via a stairwell from the aforementioned driveway. The building that houses Apartment F is a two-story brown structure with a light adobe red Spanish tile roof. The building has two north-facing garage doors.

See photographs below.





## ATTACHMENT B

### Items to be seized

1. Documents and records relating to Laxmi Holdings, Joseph R. Hill, Lucille Kathleen Hill, Amanda Campbell, Lawrence Paille, Paul Andrew Mitchell, Mitchell Paul Modeleski, Creative Consulting Group, The Creative Consultants, Infinite Ventures, Paradise Enterprises, Millennium Business Concepts, Creative Consulting Guy, Structuring Services, Spirit Hawk Endeavors, and Sunflower Holdings, including documents and records believed to be evidence of violation of 18 U.S.C. § 371, 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1512 for the period January 1, 2006 through present.

2. Documents and records including emails, mail, and other correspondence for the period December 18, 2012 to present relating to subpoenas served to Moyer and other CCG clients and advice or direction provided by Hill, Paul Andrew Mitchell, Mitchell Paul Modeleski, or others with respect to the same subpoenas, as well as material prepared and submitted to the grand jury or other government employees in response to the same subpoenas.

3. Financial accounting records and real estate records relating to Laxmi Holdings or affiliated entities during the time period beginning January 1, 2006 through present including:

   - bank records,
   - accounts receivable,
   - accounts payable,
   - trial balance ledger,
   - daily/monthly cash journals,
   - transfers and / or transactions of funds,
   - title records,
   - lien documents and / or filings,
   - and loan applications and / or loan documents.

4. All indicia of the placement of funds into what appears to be accounts and / or investments at Federal or State chartered financial institutions, Federal or State licensed Securities Broker-Dealers, Commodities Trading Firms, Foreign Exchange Brokers, investment Advisor firms, and Investment

Companies.  Records of accounts and transactions relating to Laxmi
Holdings, or affiliated entities during the time period January 1, 2006
through present including the following:

- cash receipts,
- confirmation slips,
- securities delivered receipts,
- statements of account,
- notifications of purchase or sale,
- worksheets,
- correspondence,
- memorandums (formal/informal),
- ledger sheets,
- cash in slips,
- buy and sell slips,
- financial instruments including copies or originals of cashier's checks,
  money orders, traveler's checks, personal checks, business checks,
- applications for account,
- signature cards,
- mutual fund account records, margin account records,
- stock account records,
- bond account records,
- records of the disposition of the proceeds from each transaction including
  copies of checks issued as a result of any banking or trading transactions,
- and records of cash or stock dividends and interest paid including checks
  issued.

5. Any tax forms and government correspondence relating to Laxmi Holdings
   during the time period January 1, 2006 through present, including any forms
   or instructions published, related to, and/or used by the Internal Revenue
   Service for use by taxpayers, trusts, or foreign trusts, which also includes:

- Form 1040
- Form 1041
- Form 1120
- Form 1065
- Form 1099

2

- Form 3520
- Form 3520-A
- Form 3621
- Schedule K-1s
- Form W-7
- Form W-4
- Form 8-IMY

**AFFIDAVIT**

I, James K. Marcy, being first duly sworn, hereby depose and state as follows:

**AGENT BACKGROUND**

1.      I am a Special Agent/Criminal Investigator with the Internal Revenue Service-Criminal Investigation (IRS-CI) and have been so employed since June 24, 2004. I am currently assigned to the Denver Field Office and I work in Cheyenne, Wyoming. I have a Bachelors of Science Degree in Accounting and a Master of Science Degree in Accounting from the University of Wyoming in Laramie, Wyoming.

2.      Pursuant to my employment with IRS-CI, I was trained at the Federal Law Enforcement Training Center in Glynco, Georgia.  As a Special Agent with IRS-CI I have conducted numerous financial investigations relating to various crimes, including: false claims submitted to the Internal Revenue Service (IRS), attempts to evade or defeat the assessment or payment of taxes, aiding and abetting the preparation of fraudulent tax returns, conspiracy to defraud the United States Government, mail fraud, wire fraud, currency reporting violations, and money laundering.

3.      As a Special Agent, I have conducted or directly assisted in conducting investigations of individuals, partnerships and corporations.  Some of the investigations have focused on individuals deriving income from illegal activities such as mail/wire fraud, high yield investment schemes, Ponzi schemes, money laundering, false claims, and tax evasion.  I have experience in analyzing financial records and transactions, including documents containing fraudulent representations aimed at inducing potential investors to entrust their funds to the fraud scheme operators.  I also have experience in

1

debriefing defendants, co-conspirators, witnesses, and informants who have been involved in various federal violations including but not limited to tax fraud, money laundering and other financial crimes.

## INTRODUCTION

4.      The information contained in this affidavit is being offered for the limited purpose of this warrant application and does not encompass all of the information possessed by the government at this time.

5.      I have personally been involved in the investigation of Joseph Ruben Hill (Hill), Lucille Kathleen Hill, AKA "Kathy" (K. Hill), Amanda Campbell (Campbell) and Larry Paille (Paille).  Hill has conducted his business under various names, including but not limited to Creative Consulting Group (CCG), Golden Harvest, The Creative Consultants, Infinite Ventures, Paradise Enterprises, Millennium Business Concepts, Creating Consulting Guy, and Structuring Services.  Based on information and evidence reviewed during the course of this investigation, Hill, K. Hill, Campbell and Paille operated and promoted an abusive trust scheme primarily doing business as Creative Consulting Group.  While Hill, K. Hill and Paille were involved beginning in at least 2006, Campbell did not start working with Creative Consulting Group until approximately April 2008.  Hill used the titles of Chief Executive Officer and Chief Executive Consultant, whereas Paille and Campbell were referred to as Executive Consultants.  K. Hill supported the scheme as Chief Financial Officer and was responsible for accounts payable and accounts receivable functions.  In addition to using

the entity names listed above, Hill has owned or managed bank accounts for at least two other entities since 2010, including SunFlower Holdings and Spirit Hawk Endeavors.

6.     Hill, as well as coconspirators and clients, have used the Internet and mail to send information pertaining to his alleged illegal activities described in the following paragraphs. As recently as February of 2013, Hill has used the Internet to communicate with coconspirators and clients and to direct efforts among several CCG associates and clients to impede this investigation and tamper with the federal grand jury, which had issued subpoenas to several CCG clients as part of this investigation. Hill, Paille and others have used the facsimile and the mail to send various material to federal judges and other federal government employees including but not limited to district court employees, Assistant United States Attorneys and Special Agents. Some of the material submitted by Hill, Paille, and by others at Hill's direction question the legality of the subpoenas and the authority of various government officials. Hill directly instructed at least one subpoena recipient not to provide records in response to the subpoena she had received. In short, the government has reviewed evidence indicating that Hill and others, including Rebecca Moyer (Moyer), a CCG client in Sedona, Arizona, have conspired to impede the IRS and to tamper with or obstruct the grand jury, as described more fully in paragraphs to follow.

## RELEVANT STATUTES, PREMISES TO BE SEARCHED, AND ITEMS SOUGHT

7.     Based upon my training and experience, along with my personal knowledge of the facts of the investigation to which this affidavit relates and information obtained

3

from other IRS and United States Postal Service employees, I respectfully submit there is probable cause to believe that the personal residence of Rebecca Moyer, located at 35 Sunrise Avenue, # F, Sedona, Arizona, as more fully described in Attachment A, which is attached hereto and incorporated herein by reference, contains evidence and instrumentalities of violations of federal law by Hill and others, including (1) conspiracy to impede, impair, obstruct, or defeat the lawful function of the Department of Treasury in the collection of income taxes, in violation of 18 U.S.C. § 371 ("Klein conspiracy"), (2) corruptly persuading another person, or attempting to do so, or engaging in misleading conduct toward another person, with intent to cause or induce any person to withhold testimony, or withhold a record, document, or other object, from an official proceeding, and / or corruptly alter, destroy, mutilate, or conceal a record, document, or other object, or to attempt to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, or otherwise corruptly obstructing, influencing, or impeding any official proceeding, or attempting to do so, in violation of Title 18 U.S.C. §§ 1512; and (3) committing fraud through the wires and /or mails, in violation of 18 U.S.C. §§ 1343 (wire fraud) 18 U.S.C. §§ 1341 (mail fraud).

8.    The items sought to be searched for and seized from the location to be searched are more fully described in Attachment B, which is attached hereto and incorporated herein by reference.

## PROBABLE CAUSE

9.    This investigation is being conducted by IRS-CI and United States Postal Inspection Service.  I, along with other investigators, have obtained information from

public records checks, IRS databases, drive-by surveillances, analysis and examination of business creation documents, undercover operations, subject and witness interviews, evidence obtained from search warrants executed at Hill's previous residence and business suite on March 25, 2010 (hereinafter referred to as March 2010 search warrant evidence), and evidence obtained from a search warrant executed on February 14, 2013 on Google Inc. for records of Hill's known Gmail accounts, and ccgwebsite@gmail.com (hereinafter referred to as Hill's Gmail account records).  Any facts or circumstances which are mentioned in this affidavit are known to me either through my direct participation in this investigation or from my discussions with other law enforcement officers.  I have familiarized myself with a vast array of documents and records obtained thus far in this investigation.

10.    I am personally involved in an investigation focused on Hill's operation of business services in Cheyenne, Wyoming known as CCG, The Creative Consultants, and other similar business names.  Hill, Paille, and others through CCG have promoted an allegedly abusive trust scheme, seemingly aimed at defrauding the IRS by impairing the IRS's ability to assess and collect income taxes.  Hill has engaged in this scheme to assist clients in concealing taxable income, placing clients' personal assets and real estate into trusts to thwart IRS's attempt(s) to collect on income taxes via lien(s) or levy(s), and preventing the grand jury from obtaining evidence against him from CCG clients in connection with this investigation.  Hill has used funds generated from this business to continue his trust creation business, and to pay himself, his wife, and other associates. Some of the related individuals involved in this abusive tax scheme promotion have yet

to be identified and / or interviewed.  Prior to the execution of the search warrants of Hill's home and office in 2010, CCG advertised on a website, http://www.creative-consulting-group.com.  In addition to using this website for advertising, Hill and CCG also conducted web seminars (webinars) on the Internet and communicated to previous, current and prospective clients.

Information Obtained from Hill's Webinars

11.     As part of an IRS-CI undercover operation targeting Hill and his allegedly abusive trust scheme, an IRS-CI undercover agent (UCA) attended two webinars hosted by Hill on June 2, 2009 and July 2, 2009.  The UCA watched and recorded the webinars. Hill's webinars were password protected and only accessible by CCG clients or potential clients who signed a "CCG NON-DISCLOSURE AGREEMENT" (NDA).   All participants in this webinar were connected via the Internet and not physically in front of Hill while he promoted CCG's services.  The information that follows, through paragraph 14, was obtained from a review of the aforementioned recorded webinars (unless otherwise noted):  Campbell also participated in the June 2, 2009 webinar, although Paille was apparently not in attendance.  Hill stated Campbell and Paille are both fully trained in the services provided by CCG, while K. Hill is the administrator for CCG.

12.     Hill has been in the business of creating trusts since 1995, when he received information and a computer disk from a friend that was getting out of the business. According to Hill, the first time he created a trust for a third party was in November of 1995.  Hill has promoted his business by saying he, personally, has not filed federal income tax returns or paid any federal income taxes since approximately 1993.

13.   Hill mentioned that CCG has numerous associates working for the company.  Consistent with Hill's assertion, a review of March 2010 search warrant evidence shows that Hill has sent out emails to CCG's clients which noted that the following people are employees or representatives of CCG in the signature section of the emails:  Joseph Hill, Chief Executive Consultant; Kathy Hill, Financial Administrator; Larry Paille, Executive Consultant; Mandy Campbell; Executive Consultant; Al Johnston, Associate; Jim Dowd, Associate.  Hill represented several times that CCG has helped its clients reduce their tax liabilities and in some instances, eliminate their taxes altogether.   He also repeatedly stated, "Own Nothing, Control Everything".   Hill purported that he and his associates, through CCG, create for their clients trust packages which include a different type of trust than other companies.  Hill did not mention these other companies by name.  Hill told the participants of the webinar that the unnamed companies that create similar trusts have gotten people in trouble with the IRS.  Hill stated CCG has a specific clause in its trust package which makes it legal for people to pass all their income to their purportedly foreign trust.  Hill stated that because he adds this clause in the trust package verbiage, his clients have had no tax liability issues with the federal government.  Hill advised that CCG-created trusts are foreign trusts that do not have any federal tax liability.  Hill does inform his potential clients that any income that is earned under their social security number and name is still subject to taxation. Based on statements he has made, Hill knows income earned in the United States is taxable.  Under Hill's scheme, he suggests his clients have their foreign trust own a limited liability company (LLC) that Hill's company can also create as part of their

services. Therefore, income passing through the LLC to the foreign trust would not be subject to taxation.

14.    Hill promotes CCG's trusts as foreign trusts; he refers to them as "American Business Trusts" (ABT) and "International Business Trusts" (IBT). Hill stated that the words "American" and "International" are one and the same, and they are basically interchangeable words.

15.    The IRS database, Integrated Data Retrieval System (IDRS), shows Hill has not filed personal federal income tax returns since 1994. Nevertheless, bank account records and March 2010 search warrant evidence confirm Hill has earned significant income by selling his trust related services through CCG to his clients.

16.    This abusive tax scheme orchestrated by Hill and his associates has facilitated the evasion of federal income taxes for several of his clients. In fact, based on information collected during the investigation, it is believed that some of Hill's clients are liable for substantial amounts of taxes due and owing to the IRS as a result of utilizing CCG's trust scheme. Hill's Gmail account records revealed that on February 23, 2010, Hill sent to CCG client Judy Hawk (Hawk) an email that demonstrates his knowledge that CCG's trusts were not used simply for asset protection, but also to evade income taxes. The email included the following statements: "…one of the main reasons I've been so "down" the last couple of years is due to how CCG had turned, how I had taken the steps away from what I am truly passionate about – helping small business people – to going after anyone that was in some "investment" program that wanted a trust to get out of paying taxes – all in the context of trying to maintain financially, to "pay the bills".

That has brought me to a realization that I was wrong in doing that. A year ago I made a decision not to continue moving in the direction of commercial real estate, and went to market CCG services to anyone that could pay…".

Information Obtained from Proffer Interviews of Amanda Campbell

17.    The government conducted interviews of Campbell on January 15, 2013 and March 21, 2013, pursuant to a proffer agreement with Campbell and her legal counsel. As part of her cooperation, Campbell turned over to investigators copies of her computer files and emails relating to her work for CCG. Unless otherwise noted, the following information, through paragraph 24, was provided by Campbell during these proffer interviews:

18.    CCG generally provided their clients with a trust binder for each trust entity they created that would hold all the CCG-created trust documents. These binders appear to be standard one to two inch plastic three-ring binders, with individual trust documents contained in three-ring plastic sleeves. Each binder or package of trust documents has several peoples' names and signatures on various trust documents. These people range from the individuals who purportedly created the trust to individuals who witnessed the signing of certain documents. Hill, Campbell and possibly others on behalf of CCG recruited otherwise uninvolved individuals to sign assorted trust documents. These document signers included Hill's, Campbell's and likely others' friends, relatives, and business associates who often had no involvement with or connection to CCG or the "foreign" trusts.

19.     Campbell customized each trust per Hill's instructions and based on the individual client's needs or requests.   Campbell had different versions of trust packages referred to as IBT-H, IBT-B, and IBT-S.  The H, B, and S referred to House, Business, and Support Structure, respectively.  During the course of the investigation to date, IRS-CI Special Agent David Guest (SA Guest) and I have received physical trust binders and corresponding signed trust documents from at least three CCG clients, as well as scanned copies of signed trust documents from at least three additional CCG clients.  The signed trust documents received from these CCG clients are consistent with document details and CCG processes as described by Campbell.

20.     CCG created a Trust Identification Number (T.I.N.) for each trust it set up for a client.  These T.I.N.'s created by CCG were designed by Hill to be used by the CCG-created trusts in lieu of taxpayer identification numbers because the trusts were purportedly foreign entities.  CCG clients were instructed to provide the T.I.N. to their bank to be used on bank account opening documents where typical entities' Employer Identification Numbers are entered.  CCG trust binders generally included a document titled "Notice of Assignment of Trust Identification Number".

21.     When asked about a document in the trust binders that references an exchange of $21 of silver, Hill told clients and coconspirators it didn't really matter if clients actually exchanged the silver because "what happens within a contract is between two contracting parties" and no one else would need to know.  Hill also made a comment along the lines of the fact that he has the $21 of silver in case anyone wants to go through the motions.  Campbell is not aware of any instances where clients actually conducted a

transaction involving $21 of silver as referenced in the trust documents.   As far as Campbell knows, the only money that was exchanged during the creation of these "foreign" trust packages was the fees that CCG's clients paid to CGG for the trust documents.

22.    Hill's primary "pitch line" to potential CCG clients was about using trusts to "manage your assets".  Hill promoted trusts for asset protection and as a way to "not have all your eggs in one basket".  Hill explained that if a CCG trust client is taken to court, the assets in the trust(s) are protected because the trust(s) are not in the client's name.  Potential clients often asked about taxes and possible tax benefits of using trusts. Hill advised clients that CCG's trusts are foreign entities and have no filing requirement and no IRS tax liability for income earned by the trusts.  Hill did point out that CCG's trusts provided minimal tax benefit for W-2 wage earners because there was little flexibility in how employment income can be structured.  According to Hill, individuals earning income linked to an SSN would be liable for taxes on the income, whereas income tied to a CCG trust with a CCG-assigned T.I.N. would not be taxable.

23.    Hill determined that Campbell would use the title of Executive Consultant, although Campbell felt more like an administrative assistant or secretary because she performed primarily clerical work for CCG.  However, Hill wanted to portray Campbell as being more qualified and experienced than she was.  Hill intentionally exaggerated Campbell's credentials to give her more credibility with potential CCG clients.

24.    Campbell has continued to receive emails from Hill, including emails sent as late as February 10, 2013.  Campbell has received Hill's "blast" emails to her and others related to CCG regarding the ongoing criminal investigation.

Information Obtained from a Proffer Interview of William Rogers

25.    On September 19, 2012, the government conducted an interview of CCG client William Rogers (Rogers), pursuant to a proffer agreement with Rogers and his legal counsel, regarding two trusts Rogers purchased from CCG.  On October 31, 2012, Rogers pled guilty to one count of an indictment charging him with a violation of 26 U.S.C. § 7201 (Tax Evasion).  On March 11, 2013, Rogers was sentenced to three months incarceration and three years supervised release including five months of home confinement.  As part of his cooperation, Rogers turned over to the government trust binders for his CCG-created trusts, Indigo Creek Resources and Jasper Wells Limited. Unless otherwise noted, the information that follows, through paragraph 31, was obtained from Rogers during his proffer interview:  One of the documents within Rogers' trust binders stated he took $21 of silver in exchange for 100 units of the "Right To Distribution" in Indigo Creek Resources.  Rogers stated this document is false in that neither $21 of silver nor any other type of money was exchanged between him and the "Exchanging Party".  Campbell told Rogers the $21 of silver is "just a formality" with CCG's documents.  Rogers has never personally held $21 of actual silver in his possession.

26.    Rogers never met two of the individuals who signed various documents in his trust packages.  At Campbell's direction, Rogers' recruited a friend to sign his

documents as Managing Fiduciary Party. This friend was simply a nominee who signed the documents as a favor to him and had no other connection to or involvement with his trusts.

27. Among the documents for Rogers' Jasper Wells Limited trust was a document titled "Minutes: Seven, Acceptance of Agreement of Furnishing Support". This document summarizes a contract wherein the trust is purportedly obligated to provide financial support for Rogers' daily living expenses. In other words, this agreement authorized the payment of his personal expenses by the trust. A review of Hill's webinars revealed that Hill used the catch phrase, "Own Nothing, Control Everything", referencing how CCG provided its clients a way to either reduce or eliminate their tax liabilities while still benefitting from their income and assets.

28. Another Jasper Wells Limited trust document titled "Minutes: Nine, Opening of Bank Account(s) by Managing Agent(s)" was to be given by Rogers to the bank to assist in opening a bank account in the trust name. Campbell told Rogers the way CCG's trust documents are prepared allows the money Rogers earns to go into the trust bank account and prevents the IRS from collecting the money in the account(s). Rogers remembers both Hill and Campbell explaining the trusts' bank accounts will be set up in a way the IRS can't touch.

29. Campbell instructed Rogers to open "non-interest bearing" accounts for his trusts at Wells Fargo Bank. Campbell explained the reason to specifically open non-interest bearing accounts is that "interest bearing" accounts would generate reports to the IRS, whereas non-interest bearing accounts would not. Campbell told Rogers that CCG's

trust package, if purchased, would make it impossible for the IRS to tie Rogers to income going into the trust's bank account. Rogers did not ask and Campbell did not explain why preventing the generation of a report to the IRS was necessary if CCG's trusts were legitimate.

30.     Rogers recalled providing the Notice of Assignment of Trust Identification Number for both of his trusts to the banks when he opened the trusts' bank accounts. Campbell or Hill told Rogers that he could notify the IRS about the assignment of the T.I.N. by sending in the notice documents in the trust binders, but such notification to the IRS was not required. Campbell told Rogers some of CCG's clients sent the notice documents from their trust books to the IRS but he didn't have to do it.

31.     A review of March 2010 search warrant evidence and trust binders provided by some CCG clients to investigators revealed that another notable document found in most CCG-created trust packages is IRS Form W8-IMY, Certificate of Foreign Intermediary, Foreign Flow-Through Entity, or Certain U.S. Branches for United States Tax Withholding. Rogers recalled Campbell explaining that the Form W8-IMY was the proper document to give to his employer or a bank describing his trust as a foreign entity. Hill or Campbell also represented that Rogers' trusts were foreign entities and therefore not subject to paying United States taxes. Rogers remembers giving the Form W8-IMY from his trust package to the company for which he worked. Rogers understood when he received payment from the company, he could deposit his compensation checks into this trust's bank account and protect it from government scrutiny.

32.   A review of Forms W-8IMY in CCG trust packages of six CCG clients revealed these forms certify that the respective CCG-created trust "is a nonwithholding foreign partnership, a nonwithholding foreign simple trust, or a nonwithholding foreign grantor trust and that the payments to which this certificate relates are not effectively connected, or are not treated as effectively connected, with the conduct of a trade or business in the United States and is using this form to transmit withholding certificates and/or other documentary evidence and has provided or will provide a withholding statement, as required."  In short, the Forms W8-IMY in CCG trust packages assert the trusts were foreign trusts not subject to taxation regardless of whether or not the entities received payments connected to the conduct of a trade or business in the United States. The certifications on these various Forms W-8IMY are signed by Campbell, Paille, Hill, and Gloria Reeder (Reeder), a CCG client in Sedona.

33.   On September 28, 2012, SA Guest and I met with Campbell at her residence in Arvada, Colorado and gave her a target letter from the United States Attorney's Office - District of Wyoming.  The letter explained that she is a target of an ongoing grand jury investigation regarding her business relationship with Hill, CCG and others.  On October 2, 2012, SA Guest and I met with K. Hill at her residence located in Cheyenne, Wyoming and gave her a similar target letter.

34.   Hill's Gmail account records included thousands of emails to and from Hill, involving co-conspirators, CCG clients, and numerous unknown individuals.  SA Guest and I have reviewed hundreds of these emails.  Among the emails we reviewed were over one hundred communications between Hill and Paul Andrew Mitchell from the "Supreme

Law Firm."   Paul Andrew Mitchell appears to be a pseudonym for Mitchell Paul Modeleski (Modeleski).  The emails show that Hill reached out to Modeleski two days after SA Guest and I served the target letter to K. Hill.  Modeleski refers to himself as a Private Attorney General and reportedly lives and conducts business out of the Seattle, Washington area.  SA Guest conducted queries on the State Bar Association websites for Washington, Arizona, Wyoming, and California.  Based on these searches, it appears that, as of March 27, 2013, there are no licensed attorneys in any of these states with the last name Modeleski or with the name Paul Andrew Mitchell or Paul A. Mitchell.

35.    Hill's Gmail account records show that on October 4, 2012, Hill sent an email to Modeleski's alias name "Paul Andrew Mitchell" with an email address of supremelawfirm@gmail.com.  Hill's Gmail account records also show that according to multiple emails sent by Modeleski to Hill, Modeleski told Hill he can counsel him for a flat fee of $500, for Modeleski to review Hill's case, make a recommendation, and answer up to 3 questions.  Alternatively, Hill could retain Modeleski for litigation for $2,500.00 minimum at $250.00 per hour.  Modeleski required advance payment for either type of fee arrangement.  Modeleski indicated his business "The Supreme Law Firm" is not a charity or welfare office and must charge for services rendered.

36.    Hill's Gmail account records show that on October 9, 2012, Hill emailed Modeleski saying he sent Modeleski five $100 United States Postal Money Orders through FedEx.  Hill's Gmail account records further show that on October 11, 2012 Hill sent an email to Modeleski with three attachments.  The first two attachments were the target letters addressed to K. Hill and Campbell.  The third attachment was an email Hill

sent to 135 email addresses on or around October 8, 2012.  These 135 email recipients appear to be clients of CCG or business associates of Hill, K. Hill, Campbell and Paille. The email's subject line was titled, "Important Update on the IRS Investigation Started in 2010."  At the conclusion of this widely distributed email Hill stated, "Last, but not the least, IF the IRS does contact you, I ask that you simply say to them: "Please put your questions and concerns in writing, personally sign it, and mail it to me.  I may then respond to you."  Or something similar to that effect.  (Be nice and cordial as they are simply ignorant of the Truth).  Legally, that's all you need to say or do with them.  If by chance you do receive any written correspondence from them, I ask that you please let me know."

37.    On or about October 15, 2012, Hill sent multiple "NOTICE AND DEMAND FOR AUTHORITY" letters to me and other IRS-CI special agents who participated in the search warrant on Hill's residence in March 2010.  In summary, in these letters and their attachments, Hill demanded the IRS-CI special agents produce "…specific written authority(s) -- if any – for utilizing the phrase "Department of the Treasury" on business cards, and pre-printed forms and letterhead transmitted via U.S. Mail…".  Hill stated in this letter if the special agents did not respond within ten (10) calendar days that our "…silence will constitute fraud…".

38.    On or about October 29, 2012 Hill again sent the same "NOTICE AND DEMAND FOR AUTHORITY" letters dated October 15, 2012 to the same IRS-CI special agents mentioned in the previous paragraph who had participated in the

aforementioned search warrants. However, each of the latter letters bore a red ink stamped "PAST DUE" on the first page of each letter.

39.     On or about November 27, 2012 Hill again sent the same "NOTICE AND DEMAND FOR AUTHORITY" letters dated October 15, 2012 to the same IRS-CI special agents. Like the second set of letters, the first page of each letter was again stamped in red ink. However, each stamp on this third set read, "IN DEFAULT".

40.     These "NOTICE AND DEMAND FOR AUTHORITY" letters appear to be an attempt by Hill to corruptly obstruct, influence, or impede the official investigation of him and other known conspirators. A review of Hill's Gmail account records revealed that Modeleski sent emails in which he advised or directed Hill to send these specific "Notice and Demand for Authority" letters to the IRS-CI special agents.

41.     In late December 2012, SA Guest and I traveled to several towns in Arizona and attempted to interview CCG clients and serve them grand jury subpoenas for documents and communications relating to CCG, as well as CCG-created trusts and LLC's. These and many other CCG clients have been identified during a review of March 2010 search warrant evidence.

42.     On December 18, 2012 in the Sedona, Arizona area, SA Guest and I called CCG clients to make appointments to interview them during that week. Hill's Gmail account records show that at least four clients with whom we spoke that evening alerted Hill, consistent with the instructions he gave to his clients in his email on October 8, 2012. At 6:20 p.m. on December 18, 2012, SA Guest contacted CCG client Eric Haggard (Haggard) for this purpose and spoke to him briefly. Hill's Gmail account records show

that at 6:28 p.m. Haggard emailed Hill with the subject line titled "IRS" and informed Hill he received a call from SA Guest who "wants to ask me some questions about you, Larry Paille and the trusts."

43.     Hill's Gmail account records show that Hill responded to Haggard's email at 7:23 p.m. on December 19, 2012. In the email, Hill included the following instructions to Haggard: "if they do catch up with you, just tell them that you decline to talk to them, and to put any questions in writing, sign it, and mail it to you."

44.     I called and spoke briefly with CCG client Paula Baker on December 18, 2012 at about 6:00 p.m.  During the conversation, Baker agreed to meet with me the following day at 11:00 a.m.  Hill's Gmail account records show that Baker then emailed Hill at 10:10 p.m. on December 18, 2012 and notified him of her contact with me.  When SA Guest and I went to Baker's house for the scheduled meeting the next day, we found a note on her door that read in part, "Please put any questions you have for me in writing, sign your name and mail them to me – I do not care to have any verbal discussion with you about your investigation…"

45.     At 6:43 p.m. on December 18, 2012, SA Guest called CCG client Rebecca Moyer (Moyer).  During the conversation, Moyer agreed to meet with SA Guest at 4 p.m. the following day to answer questions regarding CCG and Hill.  When we arrived at Moyer's residence the following day, she explained she no longer wants to speak with agents.

46.     On December 18, 2012 at approximately 6:45 p.m., I called and talked with CCG client Gloria Reeder for a short time.  Hill's Gmail account records show that at

7:04p.m., Reeder emailed Hill with the subject line titled "Yikes!" and stated in the email, "What do we do about the special agent meeting with the people in Sedona?  Have you contacted anyone?"

47.     SA Guest called and spoke with CCG client Catana Tully (Tully) on December 18, 2012 at 6:50 p.m.  Hill's Gmail account records show that at 7:02 p.m., Tully emailed Hill and explained that SA Guest had contacted her regarding a criminal investigation about Hill's company.  Tully wrote in part "He of course had all the information about me through the Trust."

48.     Hill's Gmail account records show that at 9:05 p.m. on December 18, 2012, Hill sent an email to about 137 email addresses, many of which appear to be associated with known CCG clients.  The subject line of this email read, "ALERT – IRS Harassing People in Sedona."  In the email, Hill explained he has been notified of people being contacted by SA Guest and me.  Hill wrote, "All you have to do is say that YOU DO NOT WISH TO SPEAK TO THEM, and then politely ask them to PUT ANY QUESTIONS they may have IN WRITING, SIGN IT, and MAIL IT TO YOU.  That is ALL you are legally required to do.  You do NOT have to talk to them at all."  The email also included the following: "So what are they doing???  They are HARASSING good people like you, trying to use FEAR and INTIMIDATION to get someone, anyone, to say something that could possibly be incriminating against me.  Actually, they have asked/told quite a few people already that they WANT someone to testify for them against me in court.  Mandy Campbell said it best a couple of months ago when these same two "Special Agents" hand delivered her a threatening letter from the Assistant

U.S. Attorney: "I'm certainly NOT going to lie for you or lie in court!"  Hill continued in the letter, "They want to find someone that they can scare into being a "witness", confusing them with various half-truths, and outright lies.  BTW: Both Marcy and Guest are in violation of United States Codes, Title 33 U.S.C. Section 333, Title 18 U.S.C. Sections 1341, and 1961.  I have these two "Special Agents" in full Default of violating Federal Laws…Please do let me know if they do call you or try to talk to you at your home or place of business.  I am trying to keep track of their harassment, simply because if they continue doing what they are doing, some of us might seriously consider a Title 42 U.S.C. Civil Rights Lawsuit against them.  Average people like us have legally prevailed in proving 'emotional damage' by the harassment of IRS agents."

49.    Hill's Gmail account records show that on December 19th, 2012 Hill sent another email to roughly 138 email addresses including many apparent email addresses for known CCG clients.  This email, Subject line "31 Q&A on the Truth of the IRS", had an attachment with 31 questions.  Hill asserted in this email, "…the more WE KNOW of the TRUTH of the IRS, the more of the FRAUD, LIES and DECEIT is exposed of the IRS, and of what it's' "Special Agents" have done, and are still doing."  Hill also stated in this email, "For those of so inclined, if the IRS "Special Agents" give you a call, or come knocking on your door, have a copy of this 31 Q&Q [sic] about the IRS handy, and start asking them the 'hard' questions.  I'll guarantee you that these "Special Agents" CANNOT answer any of the questions."  Then Hill followed up in the email by stating, "But if they try, ask them to put their 'answers' in writing, sign it, and mail it to you."

50.     Hill's Gmail account records show that on December 20th, 2012 Hill sent yet another email to approximately 33 email addresses relating primarily to known CCG clients in Arizona.   The subject line of this email read, "IMPORTANT – IRS CID "Special Agents" Serving Document Subpoenas in Sedona".   Hill advised the recipients that SA Guest and I were going to clients' homes and places of business and serving federal grand jury subpoenas for trust and LLC records.   The email also read in part, "If they say they want to talk to you, you can simply say "I do not wish to talk to you, so please put your questions in writing, sign it, and mail it to me."…I am also asking for you to provide me a copy of any/all Subpoena documents that you receive so that I can work with Paul Andrew Mitchell and the Supreme Law Firm on quashing/stopping the Grand Jury process BEFORE it even starts."   Hill also wrote that one of his clients in the Sedona area is offering to scan the subpoenas at her place of business, at no charge.

51.     Hill's Gmail account records show that Hill sent three subsequent emails wherein he referenced Sedona area CCG client Stephanie Maciel (Maciel) being available to assist clients in scanning and emailing subpoenas or other documents to him. For instance, on December 29, 2012, Hill sent an email to seven Sedona area clients who had notified him that they were served subpoenas.   The subject line of the email read: "What to do with the Subpoenas".   In this email, Hill discussed a coordinated effort to respond to the subpoenas and solicited contributions to pay Modeleski's $2,500 retainer fee.   The email also read in part, "And a big THANK YOU to Stephanie for volunteering to help scan and email me the Subpoena documents as a pdf file…".   In another email sent to the same seven clients the following day, Hill wrote, "Judy, you still need to scan

22

and email me a pdf file of the Subpoena documents you received.  Again, call Stephanie (282-3700) if you need her assistance on that."   A query of directory assistance confirmed this phone number is registered to Creative Printing and Copy Too, at 2370 West State Route 89A, Suite 15, Sedona, Arizona.  March 2010 search warrant evidence shows that Maciel owns Creative Printing and Copy Too.  Hill's Gmail account records show that Maciel emailed to Hill scanned document regarding Reeder as well as copies of subpoenas served to her, Hawk, and Zhenya Rice (Rice).  Other Sedona area CCG clients emailed their subpoenas directly to Hill or transmitted them by some other means.

52.    Hill's Gmail account records show that in an email to Modeleski on December 20, 2012, Hill provided an update on the investigation and discussed the subpoenas his clients in the Sedona area had received.  Hill also sent as an attachment to the email a scanned copy of the subpoena served to Maciel regarding Creative Printing and Copy Too LLC.  In the email, Hill wrote in part, "I am requesting your assistance in formulating a legal plan to hopefully quash these Subpoenas, and possibly the Grand Jury proceeding itself before it even really starts."

53.    Hill's Gmail account records show that Modeleski responded to Hill shortly thereafter on December 20, 2012.  In his email to Hill, Modeleski wrote in part, "The subpoena you sent me is invalid".  Modeleski listed twelve reasons including but not limited to:  the lack of a proper seal of the U.S. District Court, the stamped names of the Clerk and Deputy Clerk are not authorized signatures, the "court lacks jurisdiction in personam", and in regards to the subpoena language "on application of the United States of America", "this is a widespread and fraudulent error on these "subpoena" forms,

because the USA have never been granted legal standing to appear in Federal Courts, either as Plaintiff or as Defendant". Modeleski included in his email, "If your clients want to confront these errors formally, on their own behalves, you (Joe Hill) do not currently have power of attorney to do so; and, you are not a licensed attorney so you cannot legally represent them in this matter. They must appear either In Propria Persona or under auspices of a duly licensed attorney. My minimum fee to Counsel each affected client of yours is the standard $500 flat fee – to review the matter and make recommendations and answer up to three (3) rounds of email questions and answers."

54.   Hill's Gmail account records show that on December 29th, 2012 Hill sent yet another email to about 138 email addresses including many apparent email addresses for known CCG clients. The subject line of this email read, "UPDATE on Subpoenas Served in Sedona". Hill's statements in this email include: "This is just a quick Update on the Grand Jury Subpoenas for documents being served by two IRS CID "Special Agents" in Sedona to Managers of Business Trusts and LLC's. So far seven Ladies have been served – no men. It seems typical for the IRS to 'pick on so-called defenseless women'. But, these Subpoenas are so legally defective that it's honestly pathetic, and you might as well call these Subpoenas "bogus', to use one of their words (that's MY opinion). If you have been served, or have received a phone call from either "Special Agent" James Marcy or Dave Guest, PLEASE LET ME KNOW ASAP. We are currently working with the Supreme Law Firm on legally responding to these Subpoenas."

55.     Hill's Gmail account records show that during December 29, through December 31, 2012, Moyer and Hill exchanged emails in which Moyer twice referenced complying with the subpoena. Twice, Hill essentially told Moyer not to worry about the situation and that he would handle it. Finally, in an email at 1:06 p.m. on December 31, 2012, Hill wrote, "...What we are NOT doing is sending in the 'requested' documents. Why? Because these Subpoenas are so illegal that it's pathetic, and we will be doing a few different things (Notices and Demands) that will 'set up' the IRS "Special Agents", and the Assistant United States Attorney, in order to get the U.S. District Court to 'Quash' (render null & void) all of the Subpoenas. And hopefully completely END the IRS and Grand Jury Investigation. I just talked to Kay...She did get served as well. Since she basically threw everything away, her response and situation may end up being much different than the rest of you." This last statement by Hill indicates that whereas Kay Frizzle discarded her trust documents, the other seven Sedona women, who had received subpoenas and had been in recent contact with Hill (including Moyer, Hawk, Reeder, Maciel, Tully, Rice, and Baker), did not discard their trust documents and still had them.

56.     During the week of December 18, 2012, SA Guest and I served grand jury subpoenas for records to thirteen CCG clients in the Sedona area. These grand jury subpoenas SA Guest and I served listed January 15th, 2013 as the date by which subpoenaed entities were commanded to comply by personally appearing or by sending requested documents to the grand jury. Seven of these subpoena recipients failed to comply with the subpoenas, four complied with the subpoenas by submitting documents

to the grand jury, and two indicated they no longer had any of the records sought by the subpoenas.

57.    A review of Hill's Gmail account records shows that during December 2012 and January 2013, Modeleski, Hill, Paille, two other individuals listed as Managing Fiduciary Party of various trusts, and eight CCG clients coordinated their responses to subpoenas for records of CCG-created trusts and LLC's.  Consistent with very specific instructions from Modeleski to Hill, and from Hill to the clients, Hill, Paille, these eight CCG clients, and two Managing Fiduciary Parties faxed and mailed material to the grand jury, as well as to the Office of the Clerk of the United States District Court in Wyoming. This material, as described in paragraphs to follow, was sent in response to and contained copies of each respective subpoena for trust or LLC records.   The clients who intentionally failed to comply with the subpoenas and instead participated in preparing and sending this material were Moyer, Reeder, Maciel, Tully, Hawk, Baker, Rice, and Kay Frizzle (Frizzle).  It should be noted that Frizzle notified agents that she discarded her trust documents and no longer possessed the records sought by the subpoena she received.  Based on a review Hill's Gmail account records and specifically an email sent by Hill to Moyer at 1:06 p.m. on December 31, 2012 (as described in more detail in paragraph 69), it appears seven of these eight individuals possessed documents that could have been turned over in compliance with the subpoenas, but chose not to do so.

58.    Based on a review of the material submitted to the grand jury and the U.S. District Court Clerk's Office in Wyoming in January 2013, as well as instructions emailed from Modeleski to Hill and from Hill to others, the material generally included

two types of documents submitted for each trust or LLC subpoena.  The material transmitted as part of this coordinated effort was faxed as well as mailed to the respective government offices.

59.    The first type of document was titled "Notice and Demand for Production of Documents", and had the respective subpoena attached to it.  These notices were generally dated January 7, 2013 and have a subject line listing "Credentials required by 5 U.S.C. §§ 2906, 3331; 28 U.S.C.951".  These notices were directed to and contain a formal demand for the U.S. District Court Clerk "to locate, photocopy and deliver a true and correct copy of your APPOINTMENT AFFIDAVITS and OATH OF OFFICE" by seven calendar days from the notice, generally listed as 5:00 p.m. on January 14, 2013. These notices included the following: "Beyond that reasonable deadline, your silence will activate estoppel…and it will also constitute fraud."  These notices were sent by clients in regards to subpoenas for records of LLC's of which they are owner or officer, and by Hill, Paille, and two others as Managing Fiduciary Party in regards to subpoenas for records of the CCG clients' trusts.

60.    The second type of document submitted on behalf of each entity to whom a subpoena was served was entitled, "Request to Appear in Writing: 18 U.S.C. 1504", and directed to the Foreperson, Federal Grand Jury.  These were seven-page documents, also attached to respective subpoenas, generally dated on January 15, 2013, and with a Subject line that read "sewer service".  These documents each listed seven specific objections to the subpoenas including but not limited to the following: "The Federal statute at 28 U.S.C. 1691 has been violated, because the "process" in question lacks the Clerk's

signature and the Court's official seal...Federal employees claiming to occupy the offices of U.S. Attorney and Assistant U.S. Attorney, District of Wyoming, have failed to produce credentials in timely reply to Request submitted under the Freedom of Information Act. A panel of federal citizens is not a lawfully convened Federal Grand Jury, due to prohibited class discrimination in the selection and summoning of potential jurors. For several decades of which we are aware, Federal "indictments" have been brought on behalf of a bogus Delaware corporation named "UNITED STATES OF AMERICA". The meaning of "sewer service" is well defined in American law." These documents also include the assertion that the United States District Court for the District of Wyoming lacks jurisdiction in this instance.

61. The many "Request to Appear in Writing" documents submitted to the grand jury made reference to the fact that their "chosen Counsel, who is a professional and nationally recognized Private Attorney General, is assisting us by forwarding a bulky set of documentary Exhibits". On or about January 10, 2013, Modeleski mailed a 100-page collection of documents to the grand jury. Included in Modeleski's large mailing was an explanation of "sewer service" that read in part, "The tricks of serving process papers can, however, reach a point that the courts will not tolerate because they subvert the purpose of service or threaten to disrupt the administration of justice. The most intolerable abuse is called sewer service. It is not really service at all but is so named on the theory that the server tossed the papers into the sewer and did not attempt to deliver them to the proper party. Sewer service is a Fraud on the court..."

62.    In addition to all of the above-referenced material, Modeleski also faxed and mailed several of the first type of document, "Notice and Demand for Production of Documents", to three Judges, the Clerk and three Deputy Clerks of the U.S. District Court of Wyoming.  After the expiration of the seven day deadline imposed within the notices, Mitchell mailed copies of each notice with a "PAST DUE" stamp affixed to the first page.  The notices included, "Beyond that reasonable deadline, your silence will activate estoppel...and it will also constitute fraud."  Like the others, Mitchell faxed and mailed this material during January 2013.

Information Relating Specifically to Rebecca Moyer and Premises to be Searched

63.    Rebecca Moyer was identified as Hill's client in this investigation during a review of March 2010 search warrant evidence.  A CCG invoice found among the March 2010 search warrant evidence reveals that in September 2006, Moyer paid CCG $2,500 for the "Creation of International Business Trust, Laxmi Holdings."  These records also revealed that Hill sent "the package with Laxmi Holdings" to Moyer's residence, the premises to be searched, via United States Postal Service Priority Mail, and the package was delivered on September 23, 2006. The March 2010 search warrant evidence includes an email from Paille to Hill on the same date.  In this email, Paille wrote "Laxmi Holdings showed up today; I will be getting with Rebecca on Tuesday to get everything signed."

64.    At 6:43 p.m. on December 18, 2012, SA Guest called Moyer at (928) 282-1602, her landline phone registered at 35 Sunrise Avenue, # F, Sedona, Arizona, the

premises to be searched.  During the conversation, Moyer agreed to meet with SA Guest at 4 p.m. the following day to answer questions regarding CCG and Hill.

65.    Hill's Gmail account records show that Moyer was included among the recipients of the email from Hill at 9:05 p.m. on December 18, 2012, regarding IRS agents' presence in the Sedona area.

66.    At approximately 4 p.m., on December 19, 2012, SA Guest and I went to Moyer's residence at 35 Sunrise Avenue, # F, Sedona, Arizona, the premises to be searched, for the pre-arranged meeting.  After greeting agents at her door, Moyer explained she no longer wants to speak with agents.  I served Moyer a subpoena for records relating to Laxmi Holdings trust and attempted to explain the subpoena to her. Moyer interrupted and stated she cannot be subpoenaed.  Moyer asked if we want to be responsible for her death.  SA Guest explained that the subpoena is simply for trust records, not for testimony, and doesn't require Moyer to travel.

67.    Hill's Gmail account records show that Moyer was included among the recipients of the email from Hill at 1:54 p.m. on December 29, 2012.  In this email, Hill referred to the subpoenas as "legally defective" and "bogus."

68.    Hill's Gmail account records show that at 8:42 p.m. on December 29, 2012, Moyer, using the email account cuttingedge@copper.net, sent the following in an email to Hill:  "Thanks Joe.  I am not able to contribute to this.  At the time, I am literally fighting for my life and cannot put any energy into this.  I will probably just send what they ask for if I am able to get even that together.  Sorry I cannpt (sic) support you. Love, Rebecca"

69.    Hill's Gmail account records show that at 12:42 a.m. on December 30, 2012, Hill responded to Moyer via email as follows: "Hi Rebecca, I will do everything necessary on my end for you, and we will get one of the other Ladies there is (sic) assist whenever necessary (getting signatures, etc.).  So please don't worry about it.  This is why we are doing this as a Group, not leaving anyone out, especially you.  I'll keep you posted.  Take care, and don't worry about this.  Joe"

70.    Hill's Gmail account records show that at 11:40 a.m. on December 31, 2012, Moyer responded to Hill via email as follows: "Thanks Joe.  If I am supposed to get a copy of the trust to the IRS, I am unable to leave my house.  It says due Jan. 15th.  Will someone come bye (sic) to get it copied at Creative Copies?"  This statement by Moyer indicates she keeps her trust documents at her home.

71.    Hill's Gmail account records show that at 1:06 p.m. on December 31, 2012, Hill responded to Moyer via email as follows:  "No.  I will be working under the guidance of Paul Mitchell of the Supreme Law Firm to create all of the various Notices and Demands that all Seven of you Sedona Ladies will be doing…Some of the Ladies already know of your limited financial situation, and that you are not able to get out to do things….What we are NOT doing is sending in the 'requested' documents.   Why?  Because these Subpoenas are so illegal that it's pathetic, and we will be doing a few different things (Notices and Demands) that will 'set up' the IRS "Special Agents", and the Assistant United States Attorney, in order to get the U.S. District Court to 'Quash' (render null & void) all of the Subpoenas.  And hopefully completely END the IRS and Grand Jury Investigation.  I just talked to Kay…She did get served as well.  Since she

basically threw everything away, her response and situation may end up being much different than the rest of you." This last statement by Hill indicates that whereas Kay Frizzle discarded her trust documents, the other seven Sedona women, who had received subpoenas and had been in recent contact with Hill (including Moyer, Hawk, Reeder, Maciel, Tully, Rice, and Baker), did not discard their trust documents and still had them.

72.    On April 18, 2013, SA Guest called Century Link Directory Assistance and confirmed a current telephone listing of (928) 282-1602 for Rebecca Moyer at 35 Sunrise Avenue, Sedona, Arizona 86336. Furthermore, as of April 18, 2013, Arizona Department of Motor Vehicle records reflect Moyer's driver's license lists her address as 35 Sunrise Avenue, Apt. F, Sedona, Arizona 86336. During the course of the investigation, no other physical addresses for Moyer have been identified for the period of January 1, 2006 to the present.

73.    Based on my training and experience, I know that individuals typically retain tax related documents and financial records for recent years at their residence.

## CONCLUSION

74.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe, Hill, K. Hill, Campbell, and Paille, along with unknown coconspirators associated with CCG have been engaged in an abusive tax fraud scheme designed to defraud the government and at times mislead clients, to commit fraud using the wires and mail and to obstruct the grand jury investigation. I further assert that in carrying out this scheme, Hill and others have committed acts in violation of 18 U.S.C. § 371, 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1512.

75.     Based on the facts and evidence summarized herein, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of violations listed in the above paragraph will be found at Rebecca Moyer's premises, 35 Sunrise Ave, #F, Sedona, AZ  86336, as more fully described in Attachment A.  I respectfully request that the Court issue the proposed search warrant.


_____
James K. Marey, Special Agent IRS-CI


SUBSCRIBED AND SWORN to before me this  23rd  day of  April , 2013.


_____
DAVID K. DUNCAN
United States Magistrate Judge